UNITED STATES, Appellee,

v.

Laymon L. WILLIAMS, Specialist Four, U.S. Army, Appellant.

No. 59,123.
CM 8700524.

U.S. Court of Military Appeals.

Sept. 25, 1989.

For Appellant: *Captain Patricia D. White* (argued); *Lieutenant Colonel Russell S. Estey* and *Captain Brian D. Bailey* (on brief); *Colonel John T. Edwards, Lieutenant Colonel Joel D. Miller, Major Stewart C. Hudson, Captain Mary C. Cantrell.*

For Appellee: *Major Gary L. Hausken* (argued); *Colonel Norman G. Cooper* and *Lieutenant Colonel Gary F. Roberson* (on brief); *Major Kathryn F. Forrester, Major Daniel J. Dell'Orto, Captain Bryant G. Snee.*

*Opinion of the Court*

SULLIVAN, Judge:

On March 10, 1987, appellant was tried by a military judge sitting alone as a special court-martial at Camp Casey, Republic of Korea. Pursuant to his pleas, he was convicted of two specifications of violating

a lawful general regulation[1] and a single specification of making a false sworn statement, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 USC §§ 892 and 934, respectively. He was sentenced to a bad-conduct discharge, confinement for 45 days, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged. The Court of Military Review affirmed the findings and sentence in a short-form opinion on September 15, 1987. This Court, on March 4, 1988 (26 MJ 170), remanded this case for further review in light of our opinion in *United States v. Lee*, 25 MJ 457 (CMA 1988), whereupon the court below, sitting *en banc*, again affirmed (10–3) the findings and sentence. 27 MJ 710 (1988).

We granted review of the following issue:

WHETHER UNITED STATES FORCES KOREA (USFK) REGULATION 27–5, WHICH FORMS THE BASIS FOR SPECIFICATION 1 OF CHARGE I, VIOLATED APPELLANT'S ARTICLE 31, UCMJ, RIGHTS AND FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION AND RENDERS HIS PLEA OF GUILTY IMPROVIDENT AND WHETHER SAID REGULATION IS PROMULGATED CONTRARY TO CONGRESSIONAL INTENT EXPRESSED IN [10] U.S.C. § 831(a) AND IS UNCONSTITUTIONAL *PER SE* IN VIOLATION OF THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION.

1. The specifications of Charge I state:

Specification 1: In that Specialist Four Laymon L. Williams, U.S. Army, C Company, 2d Aviation Battalion, 2d Infantry Division, did, at Camp Casey, Republic of Korea, a military installation located outside the territorial limits of the United States, on or about 6 September 1986, violate a lawful general regulation, to wit: Paragraph 18b(2), United States Forces Korea Regulation 27–5, dated 20 May 1986, *by failing to present upon request of his unit commander, valid and bona fide information or documentation related to continued possession or disposition of the following controlled items:* five video cassette recorders, two sets of speakers, one compact disc player,

·We hold that USFK Regulation 27–5 (20 May 1986), properly construed, is not unconstitutional *per se* and does not compel disclosures in violation of the Fifth Amendment or Article 31. *See California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971); *cf. United States v. Lee, supra.* Accordingly, appellant's guilty pleas were provident.

The parties stipulated the facts of this case as follows:

On 6 September 1986, SP4 Williams was requested by his company commander to show proper disposition of the following controlled items: five video cassette recorders, two sets of speakers, one compact disc player, one television, one stereo music system, one turntable, one tape deck, and one receiver, all of which were duty free goods that the accused purchased from AAFES [Army & Air Force Exchange Service] stores in the Republic of Korea. SP4 Williams did not show proper disposition of the goods and thereby violated paragraph 18b(2) of USFK Regulation 27–5, a lawful general regulation then in effect that SP4 Williams had a duty to obey.

At various times from 4 April 1986 to 30 July 1986, SP4 Williams purchased from various AAFES stores in the Republic of Korea a total of ten video cassette recorders, which was in violation of paragraph 39h of USFK Regulation 60–1, a lawful general regulation then in effect which it was his duty to obey, and which limited his authorized purchases of video cassette recorders to one unit.

one television, one stereo, one turntable, one tape deck, and one receiver, of a total value of about $6,660.00.

Specification 2: In that Specialist Four Laymon L. Williams, U.S. Army, C Company, 2d Aviation Battalion, 2d Infantry Division, did, in the Republic of Korea, outside the territorial limits of the United States, from on or about 4 April 1986 to on or about 30 July 1986, violate a lawful general regulation, to wit: Paragraph 39h, United States Forces Korea Regulation 60–1, dated 25 February 1985, by purchasing in excess of the authorized quantity limitations the following items: nine video cassette recorders.

(Emphasis added.)

On 30 September 1986, SP4 Williams rendered a written statement under oath which included the statement, "In 1986 all of the high value items that I purchased I sent to my grandmother." This statement was false and the accused did not then believe it to be true. The oath that SP4 Williams took that the statement was true was administered to him in an investigation in which the oath was authorized by law. The making of this false statement was to the prejudice of good order and discipline in the armed forces.

-----

We remanded this case and others to the Court of Military Review in order to receive the opinion of that court on the legality of paragraph 18(b)(2) and (3) of USFK Regulation 27–5 (20 May 1986). *See generally United States v. Jette,* 25 MJ 16, 19 (CMA 1987) (Everett, C.J., concurring). In *United States v. Lee, supra,* this Court held that the particular application of the same disclosure provision (para. 17b(2) and (3)) of an earlier version of this regulation (1982) to an unwarned suspect violated the Fifth Amendment and Article 31. Our review in that case raised a further question whether this provision was constitutionally or codally invalid on its face for purposes of court-martial prosecution under Article 92. *Id.* at 459. *See generally United States v. Austin,* 27 MJ 227, 229 (CMA 1988).

Specifically, the challenged portion of the regulation provides:

[18]b. Personnel will—

\* \* \* \* \* \*

(2) Upon request of the unit commander, military law enforcement personnel, or responsible officer, *present valid and bona fide information or documentation showing the continued possession or lawful disposition* (by serial number if manufactured with one) *of any controlled item* as listed in USFK Regulation 60–1, regardless of where or how acquired, brought into the ROK [Republic of Korea] duty-free or acquired in the ROK without payment of duty or tax.

(3) Upon request of the unit commander, military law enforcement personnel, or responsible officer, *present valid and bona fide information or documentation showing the continued possession or lawful disposition of any item brought into the ROK free of duty or acquired in the ROK free of duty or tax* that is not a controlled item and is a special interest item listed at appendix O, USFK Regulation 60–1.

(Emphasis added.)

The plurality opinion of the Supreme Court in *California v. Byers, supra,* sets the general tone for approaching this question, by stating:

Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one. Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly.

An organized society imposes many burdens on its constituents. It commands the filing of tax returns for income; it requires producers and distributors of consumer goods to file informational reports on the manufacturing process and the content of products, on the wages, hours, and working conditions of employees. Those who borrow money on the public market or issue securities for sale to the public must file various information reports; industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere. Comparable examples are legion.

In each of these situations there is some possibility of prosecution—often a very real one—for criminal offenses disclosed by or deriving from the informa-

tion that the law compels a person to supply. Information revealed by these reports could well be "a link in the chain" of evidence leading to prosecution and conviction. But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here. *Id.* at 427–28, 91 S.Ct. at 1537–38 (footnote omitted). The Supreme Court then proceeded to examine the state disclosure statute challenged in that case in light of certain considerations derived from its past opinions in order to reach a conclusion on its validity.

 Before proceeding in a similar fashion, we must particularly identify the scope of the disclosure provision at issue in this case. In this regard we are obliged to analyze this regulatory provision employing certain well-established canons of construction. Statutes which impose criminal sanctions must be strictly construed. *See Dowling v. United States,* 473 U.S. 207, 213–14, 105 S.Ct. 3127, 3131–32, 87 L.Ed.2d 152 (1985). Regulations, such as the one at issue in this case, which also form a basis for criminal sanctions, are similarly subject to this "rule of strict construction." *See United States v. Mersky,* 361 U.S. 431, 440, 80 S.Ct. 459, 464, 4 L.Ed.2d 423 (1960); *cf. United States v. Reed,* 24 MJ 80, 81 (CMA 1987). In addition, where a regulation is attacked as unconstitutional or violative of a statute, "a narrowing construction" is mandated, if possible, to avoid these problems. *See Boos v. Barry,* 485 U.S. 312, 331, 108 S.Ct. 1157, 1169, 99 L.Ed.2d 333 (1988). In light of the constitutional and codal problems raised in *United States v. Lee, supra,* we must construe this disclosure regulation narrowly.

 The operative language of this regulation requires a servicemember, upon request, to "present valid and bona fide information or documentation showing the continued possession or lawful disposition ...

of" specified items. A limited construction of this language suggests that the servicemember must show physical possession of the item or must possess some type of documentation or other papers showing lawful disposition if the item is no longer in his possession. Indeed, additional regulations applicable to this command and these activities provide for such recordkeeping. *See* Appendix I and II. Different questions or additional questions in combination with the original request to produce the item or documentation are not authorized. This construction of the regulation would avoid one major problem raised in *United States v. Lee, supra,* namely, the scope of inquiry permitted by the regulation.[2]

The Court of Military Review opinion established the proper analysis for sustaining this regulation so construed:

First, we must consider whether the reporting requirement occurs in an area "permeated with criminal statutes" or in an area "essentially noncriminal and regulatory." *California v. Byers,* 402 U.S. at 430, 91 S.Ct. at 1539 (citing *Albertson v. Subversive Activities Control Board,* ... [382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965)], and *Marchetti v. United States,* ... [390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968)]). Second, we must consider whether the reporting requirement focuses on a "highly selective group inherently suspect of criminal activity" or on the public in general. *Compare Albertson v. Subversive Activities Control Board, supra, with California v. Byers, supra.* Finally, we must determine whether compliance would force an individual to provide information that "would surely prove a significant 'link in a chain' of evidence tending to establish his guilt." *Marchetti v. United States,* 390 U.S. at 48, 88 S.Ct. at 703. Upon considering these factors, a court may conclude that the particular disclosures required under a regulatory or statutory scheme are inevitably self-incriminating.

---

2. Lee was directed "that he should 'show Lieutenant Krause the presence or whereabouts of these items.'" *United States v. Lee,* 25 MJ 457,

459 (CMA 1988). Clearly, this direction extended beyond the production of documents.

*See, e.g., Marchetti v. United States, supra; Grosso v. United States, . . .* [390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968)]. Stated otherwise, we must determine whether the disclosure requirement set forth in USFK Reg. 27–5 requires an "inherently risky" disclosure of an "inherently illegal activity." *California v. Byers*, 402 U.S. at 431, 91 S.Ct. at 1539.

[ ]

Considering the disclosure requirement of USFK Reg. 27–5 in light of the factors identified above, we find the following. First, the disclosure requirement is one essentially regulatory in nature. The regulatory purpose underlying the regulation is the prevention of black market activities in violation of the tax and customs laws of the Republic of Korea. These laws are prescriptive in nature; that is, these laws require those engaging in regulated transactions to pay a tax on those transactions. By international agreement, American servicemembers are granted broad exemptions from these taxes and customs duties. Facilities and Areas and the Status of United States Armed Forces in Korea, articles IX, XIII, and XIV [hereinafter SOFA]. This international agreement also provides, however, that the United States armed forces "shall take such steps as are necessary to prevent abuse of [these] privileges" and shall render "all assistance within their power to ensure" the payment of duties and taxes. SOFA, article IX, paragraphs 8 and 9. The disclosure requirement compels those claiming the exemption to demonstrate that their activities and transactions are tax-exempt. The criminal sanctions which attend these requirements are enforcement provisions of an overall regulatory scheme. Merely engaging in the transactions subject to the disclosure requirement will not necessarily result in a criminal prosecution because the SOFA expressly permits the tax-free transfer of goods between persons qualifying for the exemption and implicitly permits the transfer of goods upon payment of the appropriate taxes when the transfer does not qualify

for an exemption. Accordingly, the requirement is essentially regulatory in nature although criminal penalties may attend noncompliance.

Second, while the requirement focuses solely on those entitled to tax and customs exemptions, it does not focus on a "highly selective group inherently suspect of criminal activity." Importing or purchasing goods free from duty and the transfer of goods free from tax are not inherently criminal activities. Such activities may be entirely lawful. Consequently, the disclosure requirement poses only the "mere possibility" of self-incrimination. *Cf. California v. Byers, supra.*

Finally, disclosures made in compliance with the regulation will not in the usual circumstance provide the government with a significant link in a chain of evidence tending to establish guilt. Again, we stress that a servicemember may purchase items free from customs duty and transfer those goods to another entitled to the exemption without incurring tax, duty, or criminal penalty. Accordingly, the disclosure required by USFK Reg. 27–5 will not "surely" provide evidence supporting a criminal prosecution.

Consequently, the disclosure requirement here is one where only a "mere possibility" of incrimination attends compliance with the regulatory mandate.

27 MJ at 717–18.

A question, of course, exists whether the above analysis need even be conducted in light of our narrow construction of the regulation. *See California v. Byers, supra* 402 U.S. at 431–32, 91 S.Ct. at 1539–40. Production of the item or the documents specified by regulation showing the proper disposition of the same would seem to fit squarely within the required-records exception to the Fifth Amendment privilege. *See Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); *cf. Marchetti v. United States, supra* 390 U.S. at 57, 88 S.Ct. at 707. Chief Judge Everett's concern in *Lee* that this exception was not established because the regulation as

applied required more than "mere record keeping," 25 MJ at 465, would be obviated.

Finally, we are troubled by the fact that "the act of producing the" item or the required papers may have some incriminating implications concerning ownership of unauthorized items. *See United States v. Doe*, 465 U.S. 605, 612–13, 104 S.Ct. 1237, 1242–43, 79 L.Ed.2d 552 (1984). However, in view of the numerous regulatory exceptions to the authorized number of items, such an inference should be considered neither testimonial nor incriminating. *See California v. Byers, supra* 402 U.S. at 433–34, 91 S.Ct. at 1540–41. In addition, we are concerned that failure to produce the same may have some testimonial implications concerning black-marketing.

We note, however, that, under our construction of the regulation, appellant is not required to acknowledge he purchased the items. *See Doe v. United States*, 487 U.S. 201, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988). Moreover, the more reasonable inference to be drawn is that a soldier simply failed to fill out the required paperwork when he disposed of the item. In any event, we think these possible incriminatory implications by themselves do not justify voiding this regulation properly construed in accordance with *Byers* and *Shapiro. See United States v. Doe, supra* 465 U.S. at 607 n. 3, 104 S.Ct. at 1239 n. 3

■ In light of the above, we reject appellant's argument that his pleas were improvident and that the military judge should have recognized a potential Fifth Amendment or Article 31 defense in his case. Here, the evidence of record does not show that appellant was a suspect at the time of questioning or that he was asked questions which violated the Fifth Amendment or Article 31. *Cf. United States v. Lee, supra.* Accordingly, we find no error in the military judge's acceptance of appellant's pleas.

The decision of the United States Army Court of Military Review is affirmed.

APPENDIX I

USFK Regulation 643–1 (4 May 1982), provides, in relevant part:

4. DEFINITIONS. a. Duty free goods. Goods which were imported into or purchased in Korea free of duty.

b. Transfer. Surrendering the possession of, or title to, duty free goods by sale, gift or donation.

5. POLICY. The transfer of duty free goods to another person, organization, agency, or activity authorized duty free import privileges is permitted without special authorization. This type of transfer may be accomplished at any time prior to the seller's or donor's permanent departure from the ROK [Republic of Korea]. Personnel unable to dispose of their POV [Privately Owned Vehicle] prior to their permanent departure from the ROK may leave the vehicle provided a power of attorney is duly executed and the recipient thereof is entitled to own or possess the POV under the provisions of USFK Reg 55–71. *When the item to be transferred has a serial number or is a controlled exchange item, the transfer will be accomplished by a written instrument signed by both parties and countersigned by either the commander/commissioned officer/civilian supervisor (equivalent grade) of both parties.* In the case of a transfer by sale, USFK Form 20 (Bill of Sale), a sample of which is at Appendix A, will be used. The seller will not transfer nor will the buyer take possession of the property until their identities have been verified on the USFK Form 20 by their respective commander/commissioned officer/civilian supervisor (equivalent grade).

6. PROCEDURES. a. General. *All documents received in connection with the transfer of items which have a serial number and controlled exchange items will be retained by the seller/donor and presented on demand to responsible officer and/or appropriate law enforcement personnel. Failure to present any requested documents may be considered*

to be a prima facie violation of this regulation.

b. When items which are specified below are transferred between persons authorized duty free import privileges, all transfer documents required by this regulation will be prepared in four copies and distribution made as follows: original copy goes to the buyer; one copy goes to the seller; and two copies go to Cdr, USFK, ATTN: PMJ–O–CP, APO [San Francisco] 96301, within 10 days of the transaction. USFK Form 20 must be countersigned by the commander/commissioned officer/civilian supervisor (equivalent grade) of both the buyer and seller. By countersigning the USFK Form 20 these persons attest to the accuracy of the member's name and address as they appear on the form.

c. Items requiring this procedure are those controlled items (LOAPR/CIPR/HVPR [Letter of Authorization Purchase Record/Controlled Item Purchase Record/High Value Purchase Record]) costing more than $35 or which have a serial number, all firearms, and POVs.

d. Items not requiring this procedure are those controlled items (LOAPR/CIPR/HVPR) costing not more than $50 and given as gifts to personnel authorized duty free import privileges. *However, it is recommended that a written record (USFK Form 20) of the gift be maintained so that proper disposition of the item(s) can be shown if requested by the unit commander/Responsible Officer (RO) or law enforcement officials.*

(Emphasis added.)

### APPENDIX II

USFK Regulation 643–2 (4 May 1982), provides, in relevant part:

6. PROCEDURES. *a. Transfer of duty free goods to persons not authorized duty free import privileges.*

(1) *An individual's request for approval to transfer duty free goods will be approved/disapproved by Cdr, USFK or his designated representative who will furnish a copy of said approval (USFK FL 2EK) to the Collector of Customs, ROK.*

(2) Authority to transfer may be granted to those personnel with an estimated date of departure (end of tour) from the ROK of 130 days or less or to personnel who have been in possession of used items for at least one year which are no longer serviceable, useful, or needed. The seller/donor will follow procedures outlined in paragraph 6a(3), below. Exception to the time limitation may be made with the approval of the Minister of Finance, ROK, or his designated representative. *To obtain an exception, the seller will prepare and forward one copy of USFK FL 2EK (Request to Transfer Duty Free Items)(Appendix B) through command channels to Cdr, USFK, ATTN: PMJ–O–CP, APO 96301* and explain in paragraph 1c of the request why an exception is being requested. The request will be dispatched by the CCO [Customs Clearance Officer] for action by the Commissioner, Department of Customs Administration, ROK. After action by the Commissioner, the request with answer will be returned to the seller/donor by the CCO via HQ USFK FL 6 (Transfer of Duty Free Item(s)).

(3) The following procedures apply to those persons who desire to transfer other than by gift or donation one of the specific duty free goods listed in Appendix A. Such goods must mandatorily be offered to a designated/licensed organization or individual (licensed buyer).

(a) The seller will contact the office of the local Provost Marshal/Chief, Security Police (PM/CSP) (Appendix C) for the name and telephone number of the licensed buyer in the area. The licensed buyer must possess an identification card shown in Appendix D. The seller will contact the licensed buyer and negotiate the transfer price of the item. Current market value, Korean customs duty, and other expenses should be considered.

(b) Once an agreement has been reached, the seller will prepare the transfer agreement (USFK FL 2EK) in four copies. The seller will give one copy to the licensed buyer and submit three copies of USFK FL 2EK through command channels to Cdr, USFK, ATTN: PMJ–O–CP, APO 96301. The seller's responsible officer (RO) as designated in Appendix E, USFK Reg 60–1 will verify that the proposed transaction is officially authorized and then will grant the authority to transfer the item(s) to the licensed buyer. When the RO certifies the transfer, one copy of the USFK FL 2EK will be indorsed back to the seller who will retain this approval. The RO will forward two copies of the certified USFK FL 2EK to Cdr, USFK, ATTN: PMJ–O–CP, APO 96301 for further routing. Final approval/disapproval authority rests with the appropriate ROKG authority.

(c) Upon receipt of the approval from the RO the seller may transfer the item(s). The licensed buyer is responsible for delivery and clearing the purchased item with Korean customs officials within 30 days of the date of transfer. The seller is not responsible for insuring that the customs duties are paid.

(d) If the licensed buyer does not purchase the item or if the item is declared unserviceable by the licensed buyer and the owner still desires to sell, the local PM/CSP should be contacted. The PM/CSP will verbally notify the CCO at PMJ [Provost Marshal] that an agreement could not be reached. The PM/CSP will provide the name and address of the seller and the name and telephone number of the licensed buyer to the CCO at PMJ who will then provide all information to the Collector of Customs, ROK, the same day it is received, if possible. The Collector of Customs, ROK[,] will arrange for the item to be inspected within five days at the seller's residence/office. After five days or after the item has been inspected by a ROK customs official, the seller is free to dispose of the item to any individual buyer using the procedures in paragraph 6a(4), below. The five day period begins when the PM/CSP gives the required notice to the CCO at PMJ.

(4) The following procedures apply to those persons who desire to transfer an item listed at Appendix A that was not purchased by a licensed buyer or any item sold to other than a licensed buyer regardless of its selling price unless excepted by paragraph 6a(5), below.

(a) The seller will complete a USFK FL 2EK in four copies, retain one copy, give one copy to the buyer, and forward two copies through command channels to Cdr, USFK, ATTN: PMJ–O–CP, APO 96301. The two copies sent to PMJ must be accompanied by a copy of the buyer's residence registration (Appendix E) and his/her seal certificate.

(b) The seller's RO will verify that the proposed transaction is authorized and forward the paperwork to the CCO at PMJ. The CCO at PMJ will verify from these documents that the proposed transaction meets the requirements in the SOFA and this regulation. If approved, the documents will be forwarded to the Collector of Customs, ROK[,] for final approval and determination of customs duties. If disapproved, the document will be returned to the seller with an explanation of why the proposed transfer was disapproved.

(c) Within 7 days of receipt of the documents, the Collector of Customs will notify PMJ of approval/ disapproval of the transfer agreement. If disapproved, the Collector of Customs will specify the reason for disapproval. Failure to notify PMJ within this time period will constitute an approval of the transfer agreement.

(d) The CCO at PMJ will send the approved/ disapproved USFK FL 2EK through command channels to the seller.

(e) The seller may transfer the item(s) only after receiving the approved USFK FL 2EK. The buyer is responsible for paying the customs duties as assessed by the Collector of Customs within 30 days

of transfer. The seller is not responsible for insuring that the customs duties are paid.

(5) As an exception to the provisions of paragraph 6a(3) and (4), above, duty free goods which have been in Korea and in the possession of the seller/donor for more than one year can be transferred without notice to the Collector of Customs if the items are sold for less than $100 or are unserviceable. However, it is recommended that a written record of the transfer (for example, USFK FL 2EK) be maintained by the seller so that proper disposition of the items can be shown IAW paragraph 36q, USFK Reg 60–1 if requested by the unit commander or law enforcement officials. This is especially true for exchange items costing $35 or more and for Exchange Letter of Authorization Purchase Record/Controlled Item Purchase Record (LOAPR/CIPR) items listed in Appendix D, USFK Reg 60–1.

(6) If an individual disposes of a LOAPR/CIPR item IAW provisions indicated above, ROs/unit commanders are reminded of the contents of paragraph 19a(1) and (2), USFK Reg 60–1 which states that:

(a) A patron may make an additional purchase of an item when justified and approved by his RO; and

(b) All personnel are required to obtain JK Form 457 (LOAPR) from their RO for subsequent purchases of all exchange LOAPR/CIPR items listed in Appendix D, USFK Reg 60–1.

b. Gifts to persons or organizations not authorized duty free import privileges.

(1) Gifts defined in paragraph 4 of this regulation may be given at any time without special authorization provided the value or purpose meets the applicable definition in this regulation.

(2) Prohibited items, defined in paragraph 4 of this regulation, may not be given to persons or organizations not authorized duty free import privileges.

(3) Per agreement with the ROKG Government, no customs duties will be assessed against the donor or recipient of a gift.

(4) No special procedures exist to give either a bona fide gift or maintenance gift to an individual. *However, it is recommended that a written record of the transfer (for example, USFK FL 2EK) be maintained by the donor so that proper disposition of the item(s) can be shown if required by the unit commander or law enforcement officials.* This is especially true for exchange items costing $35 or more and for LOAPR/CIPR items identified in Appendix D, USFK Reg 60–1 regardless of how acquired.

(5) A welfare gift of foreign origin exceeding $50 per unit in value must be reported to the Collector of Customs, ROK. To report a welfare gift, the donor will prepare three copies of USFK FL 2EK, retain one copy, give one copy to the recipient of the gift, and send the third through command channels to Cdr, USFK, ATTN: PMJ–O–CP, APO 96301. The donor will explain in paragraph 1c of the form that this is a welfare gift. Advance approval to transfer is not required.

COX, Judge (concurring):

I concur. *See United States v. Lee*, 25 MJ 457, 465 (CMA 1988) (Cox, J., concurring in part and dissenting in part).

EVERETT, Chief Judge (dissenting):

In my concurring opinion in *United States v. Lee*, 25 MJ 457, 465 (CMA 1988), I observed:

In the present case, the presentation of "valid and bona fide information or documentation" required by the regulation would have "testimonial aspects and an incriminating effect." Moreover, a failure to present the "information or documentation" is given the testimonial aspect of constituting an implied admission by the accused that no such data exist; and, in turn, this admission is the sole

basis for convicting him of violating the regulation.

More recently, Judge Smith, in expressing in the court below his view that the regulation involved in this case is unconstitutional, stated:

> The regulation circumvents the Constitution by permitting "testimonial silence" to be used as the basis for criminal convictions. It does so, in effect, by ordering soldiers to be crime free. A soldier's failure to comply with the regulation's requirement to prove innocence concedes guilt. Absent the protection of the Constitution, a situation has been deliberately created in which soldiers are compelled to be witnesses against themselves.[1] *See United States v. Lee*, 25 M.J. 457, 464–465 (C.M.A.1988) (Everett, C.J., concurring).

It is painfully clear, despite arguments to the contrary, that the regulation is most often used when a soldier is suspected of unlawful sale or transfer of controlled items. I find it repugnant and logically inconsistent to, under any circumstance, look a soldier in the eye and tell him that our Constitution guarantees him the right to remain silent but that as a soldier he is ordered to produce certain information and that if he exercises the right to remain silent we will prosecute him. *See Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965) (requiring members of the Communist Party to register as such when membership itself was a criminal offense is inconsistent with the protections under the Self–Incrimination Clause of the fifth amendment).

In this case, a soldier is ordered to prove lawful disposition and failure to obey that order is itself a criminal offense. The process by which the Army extracts or attempts to extract incriminating evidence in these cases is directly contrary to the spirit and intent of the fifth amendment. Such a procedure is particularly reprehensible within a military context where soldiers who are trained to respond to commands are virtually powerless before superior authority.

---

[1] Here, the government does not require a continuous accounting record but instead bases violations upon a soldier's failure to respond to an order to account for controlled items. There is a substantive difference between a prosecution for failure to maintain proper records and failure to obey an order to prove innocence. Indeed the regulation in these cases does not meet the requirements of the required records doctrine announced in *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), because of its failure to require the keeping and preserving of records. *See Marchetti v. United States*, 390 U.S. 39, 57, 88 S.Ct. 697, 707, 19 L.Ed.2d 889 (1968) (the required records doctrine did not apply where *inter alia* petitioner was not required to keep records but to provide information which was "not significantly different from a demand that he provide oral testimony.")

27 MJ 710, 729–30 (1988).

By his narrow construction of the regulation involved here, Judge Sullivan has allayed some of the concerns that Judge Smith and I have expressed. However, even with the benefit of this limiting construction, I conclude that the regulation is unconstitutional *—especially as it is regularly being applied in the field and was intended to be applied by those who drafted it. Therefore, despite appellant's guilty pleas, I would set aside the finding of guilty of failure to obey and dismiss that Charge. *Cf. Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975); *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); *United States v. Hoff*, 27 MJ 70 (CMA 1988).

---

* The Supreme Court may provide further guidance in this field when it decides *Baltimore City Department of Social Services v. Bouknight*, — U.S. —, 109 S.Ct. 571, 102 L.Ed.2d 682 (1989) (court order directing parent to produce previously abused child compels incriminating testimonial communication in violation of the parent's Fifth Amendment privilege against self-incrimination). *See In re Maurice M*, 314 Md. 391, 550 A.2d 1135 (1988), which decided that issue and was also granted certiorari on April 3, 1989. — U.S. at —, 109 S.Ct. at 579.